SCHERING CORPORATION AND SUBSIDIARIES, PETITIONERS V.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8831–75.    Filed January 23, 1978.

*Richard H. Appert* and *Emanuel G. Demos,* for the petitioners.

*Marwin A. Batt,* for the respondent.

RAUM, *Judge:* The Commissioner determined a deficiency in petitioner's Federal corporate income tax for the calendar year 1969 in the amount of $143,085.07. The sole issue raised by the petition is whether petitioner is entitled, pursuant to section 901(a), I.R.C. 1954, to a credit of $224,074 for amounts withheld and paid to Switzerland by petitioner's Swiss subsidiary as a withholding tax on amounts repatriated to petitioner pursuant to Rev. Proc. 65–17, 1965–1 C.B. 833, subsequent to a reallocation of income to petitioner from its Swiss subsidiary under section 482.

### FINDINGS OF FACT

Most of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner Schering Corp. is a New Jersey corporation whose principal place of business on the date it filed its petition herein was Kenilworth, N.J. Petitioner filed its Federal corporate income tax return for the calendar year 1969, on an accrual basis, with the District Director, Newark, N.J. That return was filed as a consolidated return of petitioner and its domestic subsidiaries, Schering Transamerica Corp. and Bayton Realty Corp.

Petitioner was formed in 1952 to take over certain assets held by the alien property custodian, and is now a major pharmaceutical firm. Its stock is traded on the New York Stock Exchange. It and its subsidiaries and affiliates develop, produce, and sell drugs and drug-related products and notions worldwide. Their worldwide sales have increased over the years and their organization has changed to meet operational requirements.

In 1956, petitioner organized Scherico, Ltd. (Scherico), a Swiss corporation, to own foreign patent rights, to carry out all activities necessary with respect to such patent rights, and to receive foreign royalties from licensing agreements. Scherico, from its incorporation to the present, has been wholly owned by petitioner. In 1956, 1957, and 1958, petitioner sold to Scherico for $40,212.27 in cash, foreign patents and patent applications. In 1959 and 1960, petitioner transferred other foreign patent rights to Scherico without consideration under petitioner's documentation reciting that they were contributions to capital. Additionally, petitioner in 1956 assigned to Scherico, without further consideration, various license agreements with third parties based on the aforementioned patents. During the years 1956–63, Swiss income taxes were imposed on Scherico and computed on its income without deduction for any portion of the royalty or licensing income later reallocated to petitioner under section 482.

Essex Chemie A. G. (Essex) is a Swiss corporation formed in 1959. It became a wholly owned subsidiary of Scherico on November 14, 1962, and has remained such ever since. On April 26, 1963, Essex entered into a distributorship agreement with the petitioner covering Europe, the Middle East, and the Far East. It became a "trading company" which purchased drug products, either in the form of bulk goods or substances (goods finished chemically, but requiring some further processing, packaging or labeling to be in the form suitable for sale to the

public, such as being formed into a pill or being inserted in a vial) or in the form of finished goods (goods not only chemically finished but also in the form in which sold to the public) which it then resold.

The Commissioner mailed to petitioner a statutory notice of deficiency on March 11, 1966, with respect to taxable years 1955, 1956, and 1957, and a petition was filed in the Tax Court as docket No. 2986–66. The Commissioner mailed to petitioner a statutory notice of deficiency on February 16, 1967, with respect to taxable years 1958, 1959, and 1960, and a petition was filed in the Tax Court as docket No. 2296–67. One of the principal issues in these cases was the Commissioner's reallocation from Scherico to the petitioner of all of the royalty income on the patents and license agreements which petitioner had transferred to Scherico. (The Commissioner allowed petitioner a credit for foreign taxes paid by Scherico for the years 1956 and 1957, and indicated that consideration would be given to such allowance for the remaining years upon petitioner's submitting proof of the withholding and payment of such taxes.) The cases involving the years 1955–60 were settled and a collateral agreement dated September 23, 1968, was executed. The settlement consisted of an agreement that all royalties accrued on the aforementioned patents and licensing agreements as of August 1956 were to be allocated to and included in the income of petitioner. All other royalty income from the patents and licensing agreements transferred from 1956 through 1960 was to be treated as follows: for a period of 17 years from the date of the transfer of the patents and transfer of the licensing agreements to Scherico, an amount equal to 75 percent of the gross royalty income accrued by Scherico was includable in petitioner's taxable income for each year. Of this amount, 66 percent of the gross royalties was includable as gain from the sale of capital assets held for more than 6 months and the remaining 9 percent was includable as ordinary income. (Credits for the foreign taxes withheld on the royalty payments to Scherico were disallowed except that the amount of $26,460 was allowed with respect to the year 1956.)

The petitioner's tax returns for the years 1961, 1962, and 1963 were audited, and proposed deficiencies were appealed to the Appellate Division of the Internal Revenue Service. One of the issues in dispute was whether petitioner should include in income for those years any amounts with respect to the royalty income

arising from the patents and licensing agreements transferred to Scherico from 1956 through 1960, which were the subject of the settlement and collateral agreement for the years 1955–60. The patent and royalty issues for 1961–63 were settled on the same basis as the settlement for 1955–60 and a closing agreement pursuant to section 7121, I.R.C. 1954, was executed on September 23, 1969.

Another issue raised for 1961–63 was the propriety of the selling prices charged by petitioner for material sold to Essex. The Commissioner asserted administratively, for 1963, that the sales prices charged by petitioner to Essex were not arm's length and that an allocation under section 482 was required. This issue was disposed of with an agreement increasing the sales price, and a closing agreement under section 7121 was executed on September 23, 1969.

The closing agreement entered into by the petitioner and the Commissioner with respect to the royalty and licensing income of Scherico made the following provisions for the allocation of such income to petitioner under section 482 and corresponding relief to petitioner under Rev. Proc. 65–17, 1965–1 C.B. 833:

Now It Is HEREBY DETERMINED AND AGREED for Federal income tax purposes that:

(a)(1) The said taxpayer's taxable income for the years for which section 482 allocation is made, is increased and the income of the other entity is decreased by the amount of the section 482 allocations as shown in Schedule I which is attached hereto and made a part of this agreement.

(2) The earnings and profits of the said taxpayer and the other entity are adjusted as indicated in Schedule I.

(b) The said taxpayer elects to establish and record an account receivable from Scherico, Limited, the other entity with which it engaged in the arrangement giving rise to the section 482 allocation, reflecting the following balances, such account receivable being determined to have been created as of the last day of each of the taxpayer's taxable years, for which allocation under section 482 has been made to the extent of the increase in such balance for each such year;

| Scherico, Limited | Balance of Account Receivable | | |
|---|---|---|---|
| | 1961 | 1962 | 1963 |
| | $1,188,087 | $2,583,455 | $4,184,816 |

(c)(1) The amount of interest on the account receivable described in clause (b) above which is includible in the taxable income of the said taxpayer shall be at the annual rate of 5 percent, commencing January 1, 1965, to the date of payment, or the expiration of the 90-day period after the execution of this agreement on behalf of the Commissioner, whichever comes first, and the

interest so computed shall be accrued and included in said taxpayer's taxable income for such taxable years during each of which the account receivable is deemed outstanding;

(2) The amounts of such interest includible in said taxpayer's taxable income for the taxable years ending prior to the date this agreement is executed by said taxpayer are as follows:

| Taxable Year Ended | Interest Includible |
|---|---|
| December 31, 1965 | $209,241 |
| December 31, 1966 | 209,241 |
| December 31, 1967 | 209,241 |
| December 31, 1968 | 209,241 |

(d)(1) *The manner of payment of the account receivable* referred to in clause (b) above, and interest thereon as provided in clause (c)(2) above, plus interest thereon of $104,616 for the period from January 1, 1969 to June 30, 1969 and $17,436 per month thereafter from July 1, 1969 to the end of the month in which this agreement is executed on behalf of the Commissioner, *entitling the said taxpayer to receive such payment free of further Federal income tax consequences, provided such payment is made within 90 days after execution of this closing agreement on behalf of the Commissioner, shall be as follows:*

(i) Scherico, Limited, shall pay the said taxpayer a total of $4,126,396 in United States dollars in partial liquidation of the account receivable referred to in clause (b) above and in partial liquidation of the interest thereon to June 30, 1969 computed as provided in clauses (c)(2) and (d)(1) above;

(ii) Scherico, Limited, as obligor shall issue to said taxpayer as obligee a promissory note, payable in United States dollars, in the amount of $1,000,000 applicable to the account receivable specified in clause (b) and interest thereon to June 30, 1969 computed as provided in clauses (c)(2) and (d)(1) bearing interest at the annual rate of 4 percent. The promissory note will be paid on or before five years from the first day of the month in which this agreement is executed on behalf of the Commissioner;

(iii) Scherico, Limited, shall pay the said taxpayer an amount in United States dollars in liquidation of the monthly interest on the account receivable from and after July 1, 1969 as provided in clause (d)(1) above.

(2) *Payment of the amount of the account receivable specified in clause (b) above and the amount of the interest computed as provided in clauses (c)(2) and (d)(1) above, in the manner and within the time prescribed herein, shall not constitute taxable income to said taxpayer under Federal internal revenue laws.*

(3) If the other entity fails to make payment of the account receivable, or fails to make payment in full, within the agreed 90-day period, the unpaid account receivable, which includes accrued interest, or the unpaid portion of such account receivable, shall be cancelled by treating the amount thereof as a contribution to the capital of the other entity as of the expiration of the 90-day period specified in clause (d);

(e) The determinations in clause (a) and (c) shall be valid notwithstanding the failure of said other entity to make the payments prescribed in clause (d)
* * *

[Emphasis supplied.]

The closing agreement between petitioner and the Commissioner with respect to the sales income of Essex was in the same form as the above-quoted agreement, and contained the identical language emphasized in the above text. The balance of the "account receivable" to be set up by petitioner with respect to Essex was $296,677, effective 1963.

Pursuant to these two closing agreements, and to Rev. Proc. 65–17, petitioner established an "account receivable" of $4,184,816 from Scherico with interest thereon of $1,028,760 (a total of $5,213,576), and an "account receivable" from Essex of $296,677 plus interest of $72,932 (a total of $369,609). All such "accounts receivable" and interest thereon, totaling $5,583,185, were paid by Scherico and Essex, within 90 days after execution of the closing agreements for the Commissioner, in the following manner. First, the shareholders of Essex held a meeting on Tuesday, December 16, 1969, at which they unanimously resolved to pay a "dividend" in the amount of U.S. $369,609 to Scherico, the sole shareholder. The minutes of the shareholders' meeting recite that the "dividend is payable under the terms of the Closing Agreement dated September 23, 1969 between Schering Corporation and the Commissioner of Internal Revenue, under which agreement Schering Corporation will be granted the benefits provided in Revenue Procedure 65–17, Cumulative Bulletin 65–1, 833, or equivalent treatment, permitting the receipt of this dividend by Schering Corporation without further Federal income tax consequences." No Swiss tax was withheld on this "dividend" because Scherico undertook to pay directly any Swiss withholding tax due.[1]

Thereafter, at a shareholders' meeting of Scherico held later the same day, it was unanimously resolved to pay a "dividend" to petitioner, the sole shareholder, in the amount of U.S. $5,583,185, less 5 percent or U.S. $279,159 for the Swiss Federal withholding tax, or a net total of U.S. $5,304,026. The minutes of the shareholders' meeting contained the same recitation with respect to this "dividend" as quoted above from the minutes of the Essex shareholders' meeting.

Scherico withheld 5 percent (or $279,159) out of the payment of $5,583,185 made to petitioner pursuant to the closing

---

[1] Intercompany dividends between two Swiss corporations are in general not subject to tax in Switzerland, and any withholding tax is refunded to the recipient of the dividend.

agreements with the Commissioner and the resolution of the shareholders of Scherico, and paid this amount over to the Swiss taxing authorities. Scherico submitted with such payment a tax return dated December 30, 1969, which indicated the amount of the "dividend" and the amount of withholding, and which contained a notation that the rate of withholding was 5 percent rather than the statutory 30 percent because of the Income Tax Convention between Switzerland and the United States (the Swiss Income Tax Treaty). Income Tax Convention, September 27, 1951, United States—Swiss Confederation, 2 CCH Tax Treaties, par. 7404. No part of this payment has been refunded by the Swiss taxing authorities and no claim for such refund has been filed. Any claim for refund of the Swiss withholding taxes was and is required to be filed with the appropriate Swiss authorities within 5 years from the end of the year in which the tax was paid.

The law pursuant to which Scherico withheld and paid over to the Swiss taxing authorities 5 percent of the payment made to Schering is the Federal Withholding Tax Act (Verrechnungssteuer Bundesgesetz) of Switzerland, enacted October 13, 1965. This statute is the successor to the Ordinance of the Swiss Federal Council of September 1, 1943, and is identical to its predecessor to the extent relevant here. The Act provides, in translation, in part, as follows:

### INTRODUCTION

#### ART. 1

(1) The Confederation imposes a withholding tax on the income from movable capital, on lottery winnings and on insurance payment; to the extent provided by this statute, notification of the taxable payment is substituted for the withholding of the tax.

\*        \*        \*        \*        \*        \*        \*

#### ART. 4

(1) The withholding tax on the income from movable capital property is imposed on the interest, annuities income distributions on/and other income from:

(a) bonds, serial notes, serial debentures and debt book credits issued by a domestic person;

(b) stock corporation shares, shares in companies with limited liability, shares in co-operatives and income certificates issued by a domestic person;

(c) shares in an investment fund, or in a fund of a similar nature, issued by a domestic person, or by a foreign person in conjunction with a domestic person;

(d) account balances in accounts with domestic banks and savings banks.

      \*       \*       \*       \*       \*       \*       \*

## ART. 13

(1) The tax amounts to:

a. 30 percentum of the taxable payment, in the case of income from capital and lottery winnings \* \* \*

Dividends are included within the term "income from movable capital" subject to tax under the Act, but, pursuant to Article VI of the Swiss Income Tax Treaty, the 30-percent rate of withholding on dividends is reduced to 5 percent in the case of dividends paid by a Swiss corporation to a United States corporation which controls, directly or indirectly, at least 95 percent of the entire voting power in the Swiss corporation paying the dividend, so long as not more than 25 percent of the gross income of the paying corporation is derived from interest and dividends, other than interest and dividends received from its own subsidiary corporations, and so long as the relationship between the two corporations has not been arranged or maintained primarily with the intention of securing the reduced 5-percent rate. Pursuant to the Swiss Income Tax Treaty, Swiss tax authorities notify the Office of International Operations of the Internal Revenue Service in writing whenever there has been a reduced rate of withholding on a payment from Switzerland to a United States person; such notification was sent to the Internal Revenue Service with respect to the payments by Scherico to petitioner involved here.

Under Swiss law, the payee of a dividend subject to withholding under the Swiss Federal Withholding Tax Act is regarded as the taxpayer with respect to the tax withheld.

The payment of $5,583,185 made by Scherico to petitioner was a dividend within the meaning of the Swiss Federal Withholding Tax Act. Furthermore, transfer of such funds to petitioner pursuant to Rev. Proc. 65–17 would have been considered a constructive dividend to petitioner under the Act as interpreted by the Swiss Federal Tax Administration regardless of its characterization in corporate documents, because the Administration refused to accept the reallocation of income made by the Internal Revenue Service for purposes of application of the Swiss Federal Withholding Tax Act. The position of the Swiss Administration was stated in a ruling requested by and granted

to Scherico. This ruling, dated 12 September, 1975, and signed by Ch. Wasem, head of the audit department of the Stamp Duty and Withholding Tax Division of the Federal Tax Administration, held as follows:

> This letter is in response to your request to confirm that Scherico Ltd., Lucerne had a legal liability to withhold a 5 percent Swiss Tax of U.S. $279,159 on a payment of U.S. $5,583,185 to its United States parent.
>
> We always have refused to accept retroactive changes of the Balance Sheets and of the Profit and Loss Statements of past financial years as a result of tax adjustments made by the government of a foreign parent.
>
> When Scherico was requested to pay its parent an amount of $5,583,185, this payment was considered, under Swiss tax law, a dividend on which a 5 percent Swiss tax must be paid. The payment of such tax was properly made as it was a legal and actual liability under Swiss tax law.

The ruling of the audit department is consistent with two other rulings of the Swiss Federal Tax Administration, one an unpublished decision dated June 1, 1975, and the other a published decision dated February 9, 1976. The unpublished decision read as follows:

#### [Ruling 53]

> In the event that the fiscal authorities of a foreign country attribute to a foreign company the profits which were transferred by that company to a Swiss company and an adjustment of profits is made in an intergovernmental consultation procedure under a double taxation treaty, which adjustment is taken into account in the assessment of Swiss income taxes, then the corresponding "correcting entry" in the books of the Swiss company leads to a distribution of profits or reserves subject to withholding tax, (since no corresponding indebtedness of the Swiss company to the foreign company is created by such adjustment of profits). (See also Pfund, "Verrechnungssteuer" (Withholding Tax), Note 3.48 ad Art. 4.) This is true even if such "correcting entry" represents compensation for previous contributions or services of the foreign company.
>
> (Unpublished decision of the Federal Tax Administration No. 108333/153853 of June 1, 1975)

The published decision stated:

#### [Ruling 60]

> Decision - Federal Tax Administration - Published February 9, 1976 as 60 Article f, paragraph 1(b) of the Federal Withholding Tax Act which reads as follows:
>
> If a domestic daughter reimburses to its foreign parent company rebates received from it then these reimbursements are subject to the withholding tax

even though if they are only made because the foreign tax administration does not recognize these rebates with the foreign company as a deductible expense.

Decisions of the Swiss Federal Tax Administration are subject to judicial review by the courts of Switzerland. Petitioner and Scherico acquiesced in the Administration's position in this case, however, and did not seek judicial review.

On its 1969 income tax return, petitioner claimed a foreign tax credit under section 901 in the amount of $279,159, the full amount withheld by Scherico from the payment to petitioner made pursuant to Rev. Proc. 65–17 and the two closing agreements described above. Examination of petitioner's 1969 income tax return began in April 1973, and ended on or about September 21, 1973. Petitioner was allowed $55,085 of the $279,159 claimed as a foreign tax credit. The amount allowed was equal to the Swiss tax on that portion of the "dividend" which was allocable to interest. The disallowance of the foreign tax credit for the remainder, corresponding to the principal sum repatriated by petitioner after the section 482 reallocation, remains in dispute.

Article XVII of the Swiss Income Tax Treaty provides for "competent authority" procedures which may be invoked by a taxpayer confronted with double taxation by Switzerland and the United States.[2] During the course of the audit of petitioner's 1969 income tax return, the Commissioner wrote petitioner as follows:

> You were advised recently that we propose to recommend adjustments to your income tax liability for the taxable year ended December 31, 1969, which may have the effect of double taxation upon your related foreign entity in the treaty country of Switzerland.
>
> You are advised of your rights to seek competent authority consideration for relief from double taxation under Revenue Procedure 70–18, C.B. 1970–2, 403 dated and effective June 26, 1970.
>
> I would appreciate receiving a letter from you within thirty days of the above date indicating whether you intend to seek competent authority consideration. Should you decide not to seek such competent authority consideration at this time, you would not be prohibited from seeking it at a later date.

---

[2]The United States has tax treaties with various countries including Switzerland which provide for consultation between the "competent authority" of the United States and the "competent authority" of the other contracting country in an effort to eliminate double taxation that would otherwise result in certain situations under the respective domestic tax laws of the United States and the other country. The procedures for invoking such "competent authority" relief are set forth in detail in Rev. Proc. 70–18, 1970–2 C.B. 493. See also Rev. Proc. 77–16, 1977–19 I.R.B. 35.

We also suggest that you advise your foreign affiliates to take whatever protective action is necessary, including the filling of protective claims for refund, to stay the expiration of the statute of limitations applicable in the foreign country on allowance of a potential offsetting tax adjustment.

Petitioner made the following reply:

This is to advise you that in accordance with Revenue Procedure 65–17, Schering Corporation wishes to enter into a closing agreement with the Commissioner of Internal Revenue whereby dividend income received from Essex Chemie A. G. and Schering Corporation Pan America, S.A. will be decreased by certain Section 482 adjustments made with these respective controlled foreign corporations.

Also at this time, Schering Corporation, under Revenue Procedure 70–18, does not intend to seek competent authority consideration for relief from double taxation on other proposed Section 482 adjustments made with any controlled foreign corporations located in treaty countries.

Petitioner has never instituted competent authority proceedings in respect of its 1969 income taxes.

### OPINION

Petitioner claimed a foreign tax credit under section 901, I.R.C. 1954, for its taxable year 1969, in the amount of $279,159. This amount represented withholding on a payment of $5,583,185 which petitioner received in 1969 from its wholly owned Swiss subsidiary, Scherico, pursuant to Rev. Proc. 65–17, 1965–1 C.B. 833, and two closing agreements between petitioner and the Commissioner. Scherico withheld 5 percent of the payment, and paid that amount over to the Swiss taxing authorities, pursuant to the Swiss Federal Withholding Tax Act and the Income Tax Convention between Switzerland and the United States (the Swiss Income Tax Treaty). The Commissioner allowed the credit to the extent of $55,085 but disallowed the remainder of $224,074. We hold that petitioner is entitled to take into account the full amount of $279,159 in computing its tax credit.

The dispute between petitioner and the Commissioner had its genesis in events occurring in the mid–1950's, when petitioner transferred to its newly formed, wholly owned Swiss subsidiary, Scherico, certain patents and licensing agreements. Petitioner made the transfer at substantially less than fair market value, in part under corporate documentation reciting that the patents and agreements were being contributed to the capital of Scherico. Similarly, in 1963, petitioner entered into a distributor-

ship agreement with its second-tier Swiss subsidiary, Essex, under which petitioner sold Essex certain products at less than their fair market value. In a series of deficiency notices relating to the years 1955 through 1963, the Commissioner challenged these transactions and reallocated to petitioner under section 482 part of the income realized by Scherico and Essex by virtue of the patents, licensing agreements, and distributorship agreement.

Petitioner and the Commissioner resolved their dispute as to the years 1961, 1962, and 1963, by two closing agreements executed on September 23, 1969. The first of these agreements related to the reallocation of Scherico's income, and the second to Essex's income. Petitioner agreed to take into income in the years 1961–63 a total of $4,184,816 on account of Scherico, and in 1963 $296,677 on account of Essex; furthermore, petitioner agreed to recognize interest income of $1,028,760 in the years 1965–69 with respect to the reallocated income of Scherico, and $72,932 in the same years with respect to Essex. Thus, as of the date of the closing agreements, petitioner had recognized and been subjected to United States tax on a total of $5,583,185 based upon amounts which had actually been received by, and which as of that time still remained in the hands of the two Swiss subsidiaries.

Under the two closing agreements, petitioner elected the benefits of Rev. Proc. 65–17 in relation to the income reallocated to it from the two Swiss subsidiaries. Accordingly, petitioner set up on its books an account receivable from Scherico in the amount of $5,213,576, and an account receivable from Essex in the amount of $369,609. Then, within 90 days, petitioner caused the subsidiaries to pay to it, in cash and notes, the entire balance of $5,583,185 in the two accounts receivable. The payment of the two accounts receivable was regarded, for United States tax purposes, as the repayment of a bona fide debt, and was not required to be recognized as income to petitioner in 1969. On the advice of Swiss counsel, however, Scherico determined that the repayment could be made only in the form of a dividend from Essex to Scherico, followed by a dividend from Scherico to petitioner in the full amount of the two accounts receivable. Scherico therefore withheld, pursuant to Swiss law, 5 percent of the total payment and turned such 5 percent over to the Swiss taxing authorities. The Commissioner allowed the claimed

foreign tax credit to the extent that the withheld taxes corresponded to the interest accrued on the two accounts receivable, but denied credit for that portion of the withholding corresponding to the principal amount of the section 482 reallocation.

Section 901[3] allows a credit against United States income taxes for the amount of foreign income taxes paid or accrued by a United States taxpayer to a foreign government during the taxable year. The credit is allowed in lieu of the deduction for taxes provided by section 164 and serves to assure that a taxpayer with foreign operations or other foreign income pays one tax on that income at the higher of the United States or the foreign tax rate, but is not subjected to double taxation of the same income. The amount of credit allowable in a given year is subject to the limitations of section 904 which serve, in general, to assure that the credit will be granted only against the United States tax applicable to the foreign income, and will not have the effect of offsetting the United States tax on United States income.

Petitioner claims the benefits of the foreign tax credit with respect to amounts withheld by its Swiss subsidairy from a payment which was, under Swiss law, a dividend to petitioner. However, whether petitioner is entitled to a credit under section 901 must ultimately be determined under United States tax concepts and not "by reference to foreign characterizations and classifications of tax legislation." *Biddle v. Commissioner*, 302 U.S. 573, 579. In order for the tax to be creditable under section 901, it must be the "substantial equivalent of an 'income tax' as the term is understood in the United States." See, e.g.,

---

[3]SEC. 901. TAXES OF FOREIGN COUNTRIES AND OF POSSESSIONS OF THE UNITED STATES.

(a) ALLOWANCE OF CREDIT.—If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the applicable limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under sections 902 and 960. Such choice for any taxable year may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for such taxable year. * * *

(b) AMOUNT ALLOWED.—Subject to the applicable limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

(1) CITIZENS AND DOMESTIC CORPORATIONS.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; and * * *

*Commissioner v. American Metal Co.*, 221 F.2d 134, 137 (2d Cir.), certiorari denied 350 U.S. 829, and cases cited therein.[4] The Commissioner concedes that the Swiss Federal Withholding Tax Act, on its face, is a creditable income tax. Rev. Rul. 69–446, 1969–2 C.B. 150, modified in another respect by Rev. Rul. 74–82, 1974–1 C.B. 181. Nonetheless, the Commissioner asserts that the Swiss tax, as applied in this particular case, cannot be considered an income tax because it was levied on a non-income receipt of petitioner—the repayment of indebtedness owed petitioner by the subsidiaries.

The Commissioner's argument must be rejected for several reasons. First, even if the tax in this case falls on an item which is not taxable under the United States concepts of income taxation (including Rev. Proc. 65–17), the Swiss Federal Withholding Tax Act retains its overall character as a creditable income tax. And it is the "predominant character" of a foreign tax which controls its classification for section 901 purposes. *Keasbey & Mattison Co. v. Rothensies*, 133 F.2d 894, 898 (3d Cir.), certiorari denied 320 U.S. 739; *Santa Eulalia Mining Co. v. Commissioner*, 2 T.C. 241, 245, appeal dismissed 142 F.2d 450 (9th Cir.). Compare *Lanman & Kemp-Barclay & Co. v. Commissioner*, 26 T.C. 582; see also E. Owens, The Foreign Tax Credit 61–62 (1961).[5] Exact congruence between the foreign tax statute and American tax law is not necessary to establish that a tax is an "income tax." Indeed, the Commissioner himself has recognized that "the fact that [a foreign country] include[s] in taxable income items which are not subject to taxation in the United States will not limit the amount of credit allowable under section 131(a) of the [1939] Code [the predecessor to section 901]." Rev. Rul. 55–505, 1955–2 C.B. 578; see also I.T. 4074, 1952–

[4]It is not disputed that petitioner must be viewed as the taxpayer with respect to the taxes withheld by Scherico for the purpose of sec. 901. See Rev. Rul. 69–446, 1969–2 C.B. 150, modified in another respect by Rev. Rul. 74–82, 1974–1 C.B. 181; Rev. Rul. 57–516, 1957–2 C.B. 435.

[5]There may be cases in which it is necessary to decide if a particular portion (a given chapter, section, subsection, paragraph, clause, proviso, etc.) of a foreign tax statute predominantly an "income tax" must be singled out and treated as a "separate" tax creditable only if it satisfies the predominant character test on its own, without reference to the nature of the remainder of the statute. See, for example, *Lanman & Kemp-Barclay & Co. v. Commissioner*, 26 T.C. 582; E. Owens, The Foreign Tax Credit 61–66 (1961). However, a tax imposed on each of the individual items specified in the Swiss withholding statute, including the provision regarding "income from stock" under which the Swiss tax here at issue was levied, fits comfortably within the concept of an "income tax" as the term is understood in the United States. Accordingly, nothing in our disposition of this case turns on whether the entire Swiss withholding tax, or any portion thereof is deemed to be the relevant "tax" for purposes of the predominant character test.

1 C.B. 87, declared obsolete Rev. Rul. 68–100, 1968–1 C.B. 572; Rev. Rul. 56–51, 1956–1 C.B. 320.[6] Furthermore, several courts have allowed a foreign tax credit when the foreign tax was imposed on amounts either fully or partially exempt from United States income taxation. *Helvering v. Campbell*, 139 F.2d 865 (4th Cir.); *Dexter v. Commissioner*, 47 B.T.A. 285, appeal dismissed per curiam 32 AFTR 1642; but see *Wilson v. Commissioner*, 7 T.C. 1469.[7] While the Commissioner in those cases did not explicitly assert that the taxes involved were not "income" taxes, the fact that the credits were allowed demonstrates that foreign taxes may qualify as "income taxes" despite their occasional applicability to some items the United States would deem to be nonincome receipts.[8] The only limitation on the foreign tax credit to be found in subchapter N, subpart III–A of the Code, relating to the credit, is the percentage limitation of section 904.[9] Rev. Rul. 54–15, 1954–1 C.B. 129; Rev. Rul. 75–268, 1975–2 C.B. 294; cf. *Duke v. Commissioner*, 34 T.C. 772.

The Commissioner's argument must fail for a second reason. We cannot agree that Swiss taxation of the Rev. Proc. 65–17 payment to petitioner was inconsistent with the concept of an income tax as understood in the United States, see *Biddle v. Commissioner, supra,* even if viewed out of context from the rest of the Swiss statute. The tax at issue was applied to a receipt which, but for the administrative relief provisions of Rev. Proc. 65–17, would have been subject to dividend taxation in the United States as a distribution of earnings and profits. It would be consistent with United States tax principles to treat amounts of income shifted from a domestic parent to a foreign subsidiary as contributions to capital of the subsidiary and subsequent repatriations of these contributions as dividend distributions. Cf. M. Aidinoff, "Special Problems Involved in Dealings Between United States Corporations and Foreign

---

[6]In Rev. Rul. 55–505, 1955–2 C.B. 578, certain taxes of Venezuela and Panama were considered creditable income taxes even though they included in the income of life insurance companies certain items not taxable under U.S. law. And in I.T. 4074, 1952–1 C.B. 87, a Cuban tax was held to be creditable when applied to stock dividends paid in additional shares of the same stock, even though such dividends were thought to be outside the constitutional definition of income under U.S. law. See sec. 305(a); *Eisner v. Macomber,* 252 U.S. 189.

[7]See also *Brace v. Commissioner,* 11 T.C.M. 906.

[8]The Commissioner has acquiesced in the *Campbell, Dexter,* and *Brace* line of cases in Rev. Rul. 54–15, 1954–1 C.B. 129.

[9]See also secs. 901(b)(1) and 905 for certain definitional rules and rules for determining the amount and proper timing of the credit.

Related Corporations," 25 N.Y.U. Inst. on Fed. Taxation 413, 434–435 (1967). This is the current I.R.S. practice with respect to repatriations to a taxpayer who does not desire or fails to qualify for the benefits of the Rev. Proc. 65–17 election, which suggests that the Rev. Proc. relief is not required by statute. See Rev. Proc. 65–31, 1965–2 C.B. 1024, sec. 4.04. See also J. Ruffalo & J. Isaacs, "Foreign Income—Section 482 Allocations," 115–2d BNA Tax Management Portfolio A–57 (1976) (indicating that dividend treatment of repatriations after section 482 reallocations was the practice prior to the promulgation of Rev. Proc. 65–17). The relief provisions of Rev. Proc. 65–17 are provided only as a matter of administrative grace. Accordingly, Swiss taxation of a Rev. Proc. 65–17 repatriation as a dividend does not raise the problem of a foreign tax which falls on a receipt long believed outside of the proper scope of taxation under United States law. Cf. *Wilson v. Commissioner*, 7 T.C. 1469 (Canadian income tax imposed on recipient of a legacy, exempt from taxation under predecessor of section 102, held not a creditable income tax).

The Commissioner does not dispute the fact that petitioner actually paid the withholding tax here in issue, although he refuses to concede petitioner's allegation that the credit, if otherwise allowable, is not barred by the limitations of section 904. Assuming without deciding at this point that section 904 would not bar the credit, then, petitioner has paid a creditable foreign income tax within its 1969 taxable year and is entitled, under the clear terms of section 901, to a credit based upon the full amount of that tax. However, the Commissioner puts forth several arguments why petitioner should nonetheless be denied credit for so much of that tax as applies to the repatriation of the principal amount of the section 482 reallocations.

1. *The Closing Agreements.*—The Commissioner first argues that the credit is barred by the two closing agreements executed by petitioner with respect to the section 482 reallocations for 1961, 1962, and 1963 from Scherico and Essex. Each of those two agreements contains the following language on which the Commissioner relies:

(d)(1) The manner of payment of the account receivable * * * entitling the said taxpayer to receive such payment *free of further Federal income tax consequences*, provided such payment is made within 90 days after execution of this closing agreement on behalf of the Commissioner, shall be as follows:

\* \* \* \* \* \* \*

(2) Payment of the amount of the account receivable specified in clause (b) above and the amount of the interest computed as provided in clauses (c)(2) and (d)(1) above, in the manner and within the time prescribed herein, *shall not constitute taxable income to said taxpayer* under Federal internal revenue laws.
    [Emphasis supplied.]

The Commissioner strenuously argues that the phrase "free of further Federal income tax consequences" should be interpreted to mean that no foreign tax credit may be allowed since no such credit was specifically provided for in the closing agreements themselves. We note first, however, that the quoted phrase occurs in subparagraph (1), relating merely to the procedure to be followed by petitioner in order to obtain the benefits of the closing agreements, while subparagraph (2) states outright the benefit sought, namely, that the receipt of the payments by petitioner "shall not constitute taxable income" to it. Taking paragraph (d) as a whole, then, we think it was intended to prescribe only that petitioner need not recognize gross income in 1969 upon the receipt of Scherico's payment of $5,583,185, and that it was not intended to determine any collateral tax consequences disadvantageous to petitioner which might ensue upon the payment of that sum.[10] Indeed, the Commissioner has conceded as much, since he has allowed petitioner credit for a portion of the withholding tax corresponding to the interest on the accounts receivable even though the quoted language of the closing agreements applies in terms equally to the interest on the accounts receivable and to the principal amounts of the section 482 reallocations.

2. *Rev. Proc. 65–17.* The Commissioner further argues, however, that the closing agreements incorporated the provisions of Rev. Proc. 65–17 which, in turn, preclude the foreign tax credit here sought by petitioner. Rev. Proc. 65–17 was intended to permit United States taxpayers to make adjustments with their related foreign entities "to conform their accounts to reflect the section 482 allocations" proposed by the Commissioner. Rev. Proc. 65–17, 1965–1 C.B. 833, 834. Subject to specified conditions and procedures, it allows the United States corporation either to set up and obtain payment of an account receivable equal to the principal amount of the section 482 allocation plus interest, or to

---

[10]We note also that the "free of further Federal income tax consequences" language is taken verbatim from sec. 5.01(3)(f) of Rev. Proc. 65–17. See discussion thereof *infra* pp. 597–598.

make a retroactive adjustment to treat dividends actually received from the related entity in the year with respect to which the section 482 allocation was made as pro tanto repatriation of the section 482 allocation.[11] With respect to

---

[11]Rev. Proc. 65–17 provides in part:

SEC. 4. ADJUSTMENTS TO BE MADE OR ALLOWED.

.01 If a taxpayer qualifying under section 3 above complies with the requirements of section 5 below, *such taxpayer shall be permitted to exclude from his gross income* all or part of any dividend which

1 was received from the corporation (as defined in section 7701(a)(3) of the Code) with which it engaged in the transaction or arrangement giving rise to the section 482 allocation (the "other corporation") and

2 was included in the gross income of the taxpayer as a dividend (within the meaning of section 316 of the Code) for the year for which the allocation is made, provided that the amount so excluded shall not exceed the amount of the increase in the taxable income of such taxpayer resulting from the section 482 allocation from the other corporation less the amount of any offset which is allowed to the taxpayer under section 3 of Revenue Procedure 64–54, C.B. 1964–2, 1008, with respect to such section 482 allocation. *To the extent that a dividend is excluded from income pursuant to this paragraph, it shall cease to qualify as a dividend under section 316 of the Code or a distribution under section 963 of the Code or as a dividend for any Federal income tax purpose;* for instance, no foreign tax shall be deemed to have been paid with respect thereto under section 902 of the Code for the purpose of the credit allowed under section 901 of the Code and no dividend received deduction shall be allowed with respect thereto under sections 241 through 247 of the Code. An amount includible in income under sections 551 or 951 of the Code shall not be considered a dividend for purposes of this paragraph.

.02 If a taxpayer qualifying under section 3, above, complies with the requirement of section 5, below, such taxpayer shall be entitled to establish an account receivable from the entity with which it engaged in the transaction or arrangement giving rise to the section 482 allocation (the "other entity"). Such account receivable shall not exceed

1 The amount of the increase in the taxable income of such taxpayer resulting from the section 482 allocation from the other entity, less

2 The amount of any offset which is allowed to the taxpayer under section 3 of Revenue Procedure 64–54 with respect to such section 482 allocation, and less

3 Any amount excluded by the taxpayer pursuant to section 4.01, above, and plus

4 The interest accrued on such account receivable and included in taxable income pursuant to section 4.03, below.

Except as provided in section 4.03, below, *the account receivable may be established and paid without tax consequences,* provided that such account receivable is paid within 90 days after the date of the closing agreement required by section 5.013, below. Payment must be in the form of money, a written debt obligation payable at a fixed date and bearing interest at an arm's length rate determined in the manner provided in section 1.482–2(a)(2) of the Income Tax Regulations (or the proposed regulations if such regulations are not yet in force), or an accounting entry offsetting such account receivable against an existing debt owed by the taxpayer to the other entity.

.03 The account receivable established in accordance with section 4.02, above (except for the accrued interest) shall be deemed to have been created as of the last day of the taxpayer's taxable year for which the allocation under section 482 of the Code is made. Such account receivable shall bear interest at an arm's length rate, computed in the manner provided in section 1.482–2(a)(2) of the regulations (or the proposed regulations if such regulations are not yet in force), from the day after the date the account is deemed to have been created or from the first day of the taxpayer's first taxable year beginning after December 31, 1962, whichever is later, to the date of payment. The interest so computed shall be accrued and included in the taxpayer's taxable income for each taxable year during which the account receivable is deemed outstanding.

.04 A taxpayer's election to avail itself of the provisions of this Revenue Procedure shall in no way affect the allocation made by the Service under section 482 of the Code. Such election shall, however, affect the taxpayer's taxable income and credits *to the extent indicated by sections 4.02 and 4.03, above.*

repayment of an account receivable, Rev. Proc. 65–17 uses language similar to that found in the closing agreements, namely, that repayment may be made "without tax consequences" and "free of further Federal income tax consequences." Rev. Proc. 65–17, *supra* at sec. 4.02 and sec. 5.01(3)(f).

We think that the primary purpose of Rev. Proc. 65–17 was to permit repatriation of amounts reallocated to a United States corporation without such repatriation triggering an additional tax under section 301 as a distribution of property by the subsidiary to the parent. As such it is essentially equitable in nature,[12] and is similar in operation to section 1.482–1(d)(2), Income Tax Regs., which requires the Commissioner to make correlative adjustments in the accounts of related entities subjected to a section 482 reallocation. Given such purpose, we think that the language quoted above from sections 4.02 and 5.01(3)(f) of Rev. Proc. 65–17 should be construed to mean only that the United States parent is not required to recognize gross income under section 301 upon receipt of payment of the account receivable. We think that it should not be extended to deny the United States taxpayer a benefit available to it under other sections of the Code, without regard to whether it has received a

---

SEC. 5. PROCEDURES TO BE FOLLOWED.
.01 *Cases pending with the Internal Revenue Service.*

    \*        \*        \*        \*        \*        \*        \*

3 If the Service concludes that section 4, above, properly applies and if the amount of the section 482 allocation has been agreed upon, the taxpayer will be requested to enter into a closing agreement under section 7121 of the Code establishing for each year involved:

(a) The amount of the section 482 allocation;

(b) The amount of any tax offset allowed under section 3 of Revenue Procedure 64–54 with respect to such allocation;

(c) The amount of any dividends received which the taxpayer elects to exclude from income under section 4.01, above;

(d) The amount of interest on the account receivable includible in income pursuant to section 4.03, above, and the years of such inclusion;

(e) The net amount of the account receivable which the taxpayer elects to establish under section 4.02, above;

(f) The manner of payment of the account receivable referred to in (e) above, and *the taxpayer's right to receive such payment free of further Federal income tax consequences*, provided such payment is made within 90 days after execution of the closing agreement on behalf of the Commissioner;

(g) The amount of any foreign tax credits claimed in the taxable year of the section 482 allocation which have ceased to be allowable in that year by reason of the election by the taxpayer to exclude amounts received as dividends from gross income pursuant to section 4.01, above. Where a foreign tax credit, attributable to a dividend being excluded from gross income under this revenue procedure, has been carried back to a year for which the statute of limitations for assessment of tax has run, appropriate adjustment will be required.

[Emphasis supplied.]

[12] That the relief provided by Rev. Proc. 65–17 is essentially equitable is demonstrated by sec. 3.02, which limits the benefits of the revenue procedure to transactions not having as one of their principal purposes the avoidance of Federal income tax.

taxable distribution of property from its subsidiary. And the "direct" foreign tax credit available to a United States taxpayer under section 901 with respect to its own foreign taxes in no way depends upon the taxpayer's receipt of taxable distributions from a subsidiary corporation. We conclude, therefore, that the language of sections 4.02 and 5.01(3)(f) does not bar the direct foreign tax credit claimed by petitioner here.

We are fortified in our conclusion by the fact that Rev. Proc. 65–17 makes detailed provisions for the treatment of foreign taxes actually paid by the related foreign entity (as a taxpayer itself and not as a withholding agent for its American parent) on the income subject to section 482 reallocation. Thus, section 4.01 provides that dividends retroactively excluded from the United States corporation's gross income pursuant to Rev. Proc. 65–17 shall cease to be considered dividends for purposes of sections 902 and 316 of the Code or for any other purposes. One effect of this provision is to deny the United States corporation any deemed-paid (indirect) tax credit under section 902 corresponding to the payment no longer considered a dividend. Conversely, Rev. Proc. 65–17, in sections 4.01 and 4.02, incorporates by reference the provisions of Rev. Proc. 64–54, 1964–2 C.B. 1008, amended by Rev. Proc. 66–33, 1966–2 C.B. 1231, which permit a United States corporation to which income has been reallocated under section 482 (at least for the tax years involved herein)[13] to offset against the resulting United States taxes any foreign taxes actually paid by the related entity on the same income. In sum, these provisions effectively treat the foreign taxes levied upon and paid by the related foreign corporation as if they had been paid by the United States corporation, and accordingly grant the United States corporation a credit against its United States tax liability for the foreign taxes paid on the reallocated income. In contrast to their detailed provisions respecting the foreign entities' foreign taxes, however, neither revenue procedure makes any mention whatsoever of the possibility that the United States corporation *itself* might be (or have been) required to pay foreign taxes when that income is (was) actually repatriated to the United States.

The Commissioner argues that language in section 4.01 is

---

[13]The provisions of Rev. Proc. 64–54, 1964–2 C.B. 1008, as amended, are limited to reallocations made for taxable years beginning before Jan. 1, 1965. For later years the Commissioner's position is stated in Rev. Rul. 72–370, 1972–2 C.B. 437, and Rev. Rul. 72–371, 1972–2 C.B. 438.

sufficient to deny retroactively any section 901 direct foreign tax credit for any foreign withholding tax paid by the United States parent corporation on the receipt of the payment originally considered a dividend but recharacterized pursuant to section 4.01 as other than a dividend.[14] He further argues that credit should similarly be denied for a withholding tax such as the one in issue in this case, paid in connection with a repatriation under section 4.02. We disagree. We will not infer a purpose to cause direct tax credits to be disallowed from language denying indirect credits which is relevant and understandable only in the context of the special requirements of section 902.

In conclusion, we cannot find that Rev. Proc. 65–17, as incorporated into the closing agreements executed by petitioner and the Commissioner, foreclosed petitioner's claimed foreign tax credit.

3. *Section 482.*—The Commissioner further contends that section 482 entitles him to disallow the foreign tax credit claimed by petitioner notwithstanding petitioner's literal compliance with the requirements of section 901. Section 482 provides:

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The legislative history of section 482 indicates that it was "designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to 'milk' a taxable entity." *Ach v. Commissioner*, 42 T.C. 114, 125–126, affirmed 358 F.2d 342 (6th Cir.), certiorari denied 385 U.S. 899; *Ballentine Motor Co. v. Commissioner*, 39 T.C. 348, affirmed 321 F.2d 796 (4th Cir.); *Seminole Flavor Co. v. Commissioner*, 4 T.C. 1215, 1228. The Commissioner has broad

---

[14]The specific language relied upon by the Commissioner is underscored in the text of Rev. Proc. 65–17, sec. 4.01, quoted at n. 11 *supra.*

discretion under section 482, but his determinations will not be sustained where the taxpayer establishes that he has abused his discretion or made a determination which is arbitrary, capricious, or unreasonable. *Hamburgers York Road, Inc. v. Commissioner*, 41 T.C. 821; see *Grenada Industries, Inc. v. Commissioner*, 17 T.C. 231, 255, affirmed 202 F.2d 873 (5th Cir.), certiorari denied 346 U.S. 819.

Section 482 was intended to give the Commissioner the authority to control abuses which can arise when separate legal entities are controlled by the same interests. The Commissioner's regulations state the scope and purpose of section 482 as follows:

The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. *The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.* [Emphasis supplied.]

Sec. 1.482–1(b)(1), Income Tax Regs; *R. T. French Co. v. Commissioner*, 60 T.C. 836, 848. The tool given the Commissioner by section 482 is the right to allocate items from one controlled taxpayer to another controlled (or controlling) taxpayer; accordingly, section 1.482–1(d)(2) requires the Commissioner to make correlative adjustments in the tax treatment of the related taxpayer. Only in that way can the true taxable income of the group as a whole, as well as its individual members, be accurately determined. See *Collins Electrical Co. v. Commissioner*, 67 T.C. 911, 922–923.

In the case at hand, the Commissioner has not reallocated or reapportioned the foreign tax credit claimed by petitioner for the simple reason that there is no related entity to which such credit could be transferred.[15] Switzerland levied the withholding

---

[15]For this reason, the case at hand is easily distinguishable from the so-called "creation of income" cases. See, e.g., *B. Forman Co. v. Commissioner*, 453 F.2d 1144, 1156–1157 (2d Cir.), certiorari denied

tax in issue against petitioner itself, not against any related Swiss subsidiary, and it is petitioner, if anyone, who should be entitled under section 901 to claim credit for the Swiss tax in calculating its United States tax liability. If the Commissioner prevails here, petitioner will have suffered a real economic loss by virtue of having paid a tax to Switzerland, and no related entity will have received any corresponding benefit. As we said in *Chicago & North Western Railway Co. v. Commissioner*, 29 T.C. 989, 997–998:

> Section 45 [the predecessor of section 482] authorizes the respondent [Commissioner] to apply the broad powers of that section only if he "determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income" of either Omaha or petitioner. Respondent has made no such determination. * * *
>
> In reality, the respondent is not asking this Court to make any "distribution, apportionment, or allocation" of gross income or deductions, but instead he is now in reality asking this Court to *disallow* in each of the years 1940 to 1943, inclusive, $2,146,335 of the interest petitioner is entitled to deduct from its gross income under section 23(b). "Section 45 permits distribution, apportionment, or allocation of a deduction, but it nowhere permits disallowance thereof * * * ." *General Industries Corporation*, 35 B.T.A. 615, 617. * * * [Fn. ref. omitted.]

See also *Hypotheek Land Co. v. Commissioner*, 200 F.2d. 390, 396 (9th Cir.); *Hearst Corp. v. Commissioner*, 14 T.C. 575, 577; *General Industries Corp. v. Commissioner*, 35 B.T.A. 615; *Challenger, Inc. v. Commissioner*, 23 T.C.M. 2096, 33 P-H Memo. T.C. par. 64, 338. We conclude that section 482 does not authorize the Commissioner to disallow petitioner's claimed foreign tax credit.

4. *Exhaustion of Administrative Remedies.*—The Commissioner next argues that petitioner should be barred from taking the foreign tax credit here in issue because it failed to exhaust its administrative remedies in respect of the imposition of the Swiss tax. In the first place, he argues, petitioner did not challenge the imposition of the Swiss withholding tax in either the Swiss tax

---

407 U.S. 934; *Kahler Corp. v. Commissioner*, 486 F.2d 1, 4–5 (8th Cir.); *Latham Park Manor, Inc. v. Commissioner*, 69 T.C.199 (1977). In those cases, the Commissioner could make correlative adjustments in the accounts of related taxpayers offsetting the effects of allocating income to a particular member of the controlled group.

administration or the Swiss courts. We have found on the basis of the evidence presented, however, that the Swiss Withholding Tax Act, as interpreted by the Swiss tax authorities, required Scherico to withhold 5 percent of its payment to petitioner, and that petitioner thus was required to pay that amount of tax to Switzerland. Furthermore, Scherico did take steps to ascertain the position of the Swiss tax authorities with respect to the facts of this particular case. Petitioner is not required to take futile additional administrative steps and thus, on these facts, is not precluded from the foreign tax credit for its failure to do so. Cf. *Stamos v. Commissioner*, 22 T.C. 885, 891–893; *Baltimore Transfer Co. v. Commissioner*, 8 T.C. 1, 6–7; *Hart Furniture Co. v. Commissioner*, 12 T.C. 1103, 1108, reversed on other grounds 188 F.2d 968 (5th Cir.).

The Commissioner makes a second exhaustion-of-remedies argument based upon petitioner's failure to seek "competent authority" proceedings between Switzerland and the United States in order to eliminate any possible double taxation. Article XVII of the Swiss Income Tax Treaty provides:

(1) Where a taxpayer shows proof that the action of the tax authorities of the contracting States has resulted, or will result, in double taxation contrary to the provisions of the present Convention, he shall be entitled to present the facts to the State of which he is a citizen or a resident, or, if the taxpayer is a corporation or other entity, to the State in which it is created or organized. Should the taxpayer's claim be deemed worthy of consideration, the competent authority of such State shall undertake to come to an agreement with the competent authority of the other State with a view to equitable avoidance of the double taxation in question.

Rev. Proc. 70–18, 1970–2 C.B. 493, outlines the procedure by which United States taxpayers may obtain competent authority proceedings through the Internal Revenue Service.[16] The Commissioner argues that, if petitioner had sought and obtained competent authority proceedings in this case, an agreement between the United States and Switzerland might have been reached which would have eliminated any double taxation and thereby rendered unnecessary the tax credit here in issue.

---

[16]See also Rev. Proc. 77–16, 1977–19 I.R.B. 35. We note that Rev. Proc. 70–18, sec. 2.02, quotes examples of treaty language governing competent authority proceedings which are substantially different from the language of Article XVII of the Swiss Income Tax Treaty.

Petitioner should not be allowed the credit, says the Commissioner, because it did not take this available precaution.[17]

We have already concluded, however, that neither the closing agreements, nor Rev. Proc. 65–17, nor section 482 permitted the Commissioner to disallow the foreign tax credit sought here by petitioner, and the Commissioner has not directed us to any other basis for his action.[18] And if petitioner was therefore entitled to its foreign tax credit, there was no double taxation from which it might have sought relief through competent authority proceedings under Article XVII(1) of the Swiss Income Tax Treaty. We do not here express an opinion as to whether the mere *possibility* of double taxation (pending resolution of issues of United States law) would have been sufficient for petitioner to have invoked competent authority proceedings during the administrative review of this case. But we think that petitioner was entitled, at the least, to risk forfeiting the benefits of competent authority proceedings in order to seek the judgment of this Court on the merits of its claims under United States law in regard to the closing agreements, Rev. Proc. 65–17, and section 482.[19]

The Commissioner states on brief that the "real issue before this Court is whether the American Treasury should bear the 'cost' of the return of income rightfully taxable to an American corporation doing business in Switzerland when that income was

---

[17]The Commissioner has taken a similar position with respect to foreign tax credits under sec. 902, Rev. Rul. 76–508, 1976–2 C.B. 225. Since that ruling does not take into account the specific language of the Swiss Income Tax Treaty (which is not the same as that given as an example in sec. 2.02 of Rev. Proc. 70–18), and since it was issued subsequent to the trial in this case, we do not express an opinion as to its relevance to situations other than that presented by this case.

[18]Art. IV of the Swiss Income Tax Treaty provides:

"Where an enterprise of one of the contracting States, by reason of its participation in the management or the financial structure of an enterprise of the other contracting State, makes with or imposes on the latter, in their commercial or financial relations, conditions different from those which would be made with an independent enterprise, any profits which would normally have accrued to one of the enterprises, but by reason of those conditions have not so accrued, may be included in the profits of that enterprise and taxed accordingly."

We do not understand the Commissioner to be arguing, however, that Art. IV provides an independent basis for disallowing credit for the withholding tax levied by Switzerland, and therefore we express no opinion on the point.

[19]We note that petitioner might have been able to obtain competent authority consideration even after judicial proceedings had been commenced. Sec. 5.03, Rev. Proc. 70–18. See also sec. 5.06, Rev. Proc. 70–18, which states: "Where the litigation is pending in the United States Tax Court, the Chief Counsel will in appropriate cases ask the court to delay the trial of the case pending competent authority action * * * . The final decision on whether to delay the processing of a case rests with the court."

originally misallocated by the parent." The underlying issue seems to us, rather, a dispute between the United States and Switzerland as to which nation may tax what types of income, and how. While the United States and a number of other nations have had success in negotiating new income tax conventions which specifically provide for bilateral reallocations of income where related taxpayers have not dealt at arm's length, the Swiss treaty has not been amended. Cf. Rev. Rul. 72–437, 1972–2 C.B. 660 (discussing the United States—West Germany convention and other conventions with similar provisions); compare section 2.02, Rev. Proc. 70–18, 1970–2 C.B. 493, with Articles IV and XVII of the Swiss Income Tax Treaty. And the Swiss authorities, as shown in our findings, have been reluctant to accept reallocations proposed by the United States. We think that petitioner should not be made to bear the price of continued disagreement between the United States and Switzerland.[20] Under Article XVII(2) of the Swiss Income Tax Treaty, it is possible that the Commissioner himself could have inaugurated competent authority proceedings with a view to negotiating a bilateral solution to the problem of Switzerland's attempt to levy a withholding tax on Rev. Proc. 65–17 repatriations of reallocated income.[21] And of course, new treaty negotiations could be sought by the Commissioner. But petitioner here has paid its taxes to both Switzerland and the United States in precisely the manner contemplated by the foreign tax credit provisions of section 901. Consequently, under the circumstances of this case, petitioner is entitled to the foreign tax credit claimed with respect to Swiss Federal Withholding Tax payments. In light of other adjustments not here in issue, and in order to allow the parties to take into account any possible

---

[20]We think this is especially true with respect to years beginning before 1965, when taxpayers were not on notice that the Internal Revenue Service would challenge apparently bona fide and enforceable agreements between United States taxpayers and related foreign corporations. Compare Rev. Proc. 64–54, 1964–2 C.B. 1008, amended by Rev. Proc. 66–33, 1966–2 C.B. 1231.

[21]Art. XVII(2) provides:

"(2) Should any difficulty or doubt arise as to the interpretation or application of the present Convention, or its relationship to Conventions between one of the contracting States and any other State, the competent authorities of the contracting States may settle the question by mutual agreement."

The dispute between the United States and Switzerland over this Swiss withholding tax might be considered a "difficulty or doubt" arising as to the interpretation of Art. IV of the Swiss Income Tax Treaty, quoted *supra* at n. 18.

limitation on petitioner's foreign tax credit pursuant to section 904,

*Decision will be entered under Rule 155.*