149 T.C. No. 21

UNITED STATES TAX COURT

THE COCA-COLA COMPANY & SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 31183-15.                    Filed December 14, 2017.

P, a U.S. corporation, does business in Mexico through a branch (Licensee). For taxable years 2007-2009 Licensee paid royalties to P for the use of P's intangible property and claimed deductions for those royalties on its Mexican corporate income tax returns. P reported all of Licensee's income on its consolidated Federal income tax returns for 2007-2009 and claimed foreign tax credits (FTCs) under I.R.C. sec. 901 for the corporate income taxes Licensee had paid to Mexico.

The IRS selected P's 2007-2009 returns for examination and, exercising its authority under I.R.C. sec. 482, determined that the royalties Licensee had paid to P were not at arm's length, i.e., were too low. As a corollary of this determination, the IRS determined that Licensee had claimed insufficient deductions for royalty payments on its Mexican tax returns and to that extent had overpaid its Mexican corporate income tax. To the extent of these overpayments, the IRS determined that the taxes paid to Mexico were not "compulsory" and

hence were not "taxes" within the meaning of I.R.C. sec. 901. <u>See</u> sec. 1.901-2(a)(2)(i), Income Tax Regs.

    1. <u>Held</u>: P calculated its Mexican tax liabilities "in a manner that is consistent with a reasonable interpretation and application of the * * * provisions of foreign law (including applicable tax treaties) in such a way as to reduce, over time, * * * [its] reasonably expected liability under foreign law for tax." Sec. 1.901-2(e)(5)(i), Income Tax Regs.

    2. <u>Held</u>, <u>further</u>, P "exhaust[ed] all effective and practical remedies, including invocation of competent authority procedures available under applicable tax treaties, to reduce, over time, * * * [its] liability for foreign tax." Sec. 1.901-2(e)(5)(i), Income Tax Regs.

    3. <u>Held</u>, <u>further</u>, the Mexican taxes paid by Licensee for 2007-2009 were "compulsory" levies for which P is entitled to FTCs under I.R.C. sec. 901(a).

<u>John B. Magee</u>, <u>Kevin Lee Kenworthy</u>, <u>Sanford W. Stark</u>, <u>Saul Mezei</u>, <u>Steven R. Dixon</u>, <u>Jarrett Y. Jacinto</u>, <u>Carl T. Ussing</u>, and <u>Lisandra Ortiz</u>, for petitioner.

<u>Jill A. Frisch</u>, <u>Anne O'Brien Hintermeister</u>, <u>Julie Ann P. Gasper</u>, <u>Heather L. Lampert</u>, <u>Curt M. Rubin</u>, <u>Lisa M. Goldberg</u>, and <u>Huong T. Bailie</u>, for respondent.

OPINION

LAUBER, <u>Judge</u>:  With respect to petitioner's Federal income tax for 2007-2009, the Internal Revenue Service (IRS or respondent) determined substantial deficiencies as a result of transfer-pricing adjustments under section 482.[1]  The case is calendared for trial in Washington, D.C., beginning March 5, 2018.  Currently before the Court is petitioner's motion for partial summary judgment with respect to an issue the parties have labeled "the Mexico Foreign Tax Credit" issue.  During 2007-2009 petitioner did business in Mexico through the Coca-Cola Export Corp. Sucursal Mexico (Mexico Licensee), a branch of one of its domestic subsidiaries.  The Mexico Licensee paid royalties to petitioner for use of petitioner's intangible property.  After claiming deductions for these and other expenses, the Mexico Licensee for 2007-2009 paid income taxes in excess of $250 million to the Government of Mexico.  Petitioner reported the Mexico Licensee's taxable income on its consolidated Federal income tax returns and claimed foreign tax credits (FTCs) under section 901 for the Mexican income taxes paid.

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

In 2015 the IRS issued petitioner a notice of deficiency determining (among other things) that the royalties the Mexico Licensee had paid to petitioner were not calculated at arm's length, i.e., were too low. As corollaries of these proposed adjustments, the IRS determined that the Mexico Licensee had claimed insufficient deductions for royalty payments on its Mexican corporate returns and to that extent had overpaid its Mexican income tax. To the extent of these alleged overpayments the IRS determined that the taxes paid to Mexico were not "compulsory" and hence were not "taxes" within the meaning of section 901. See sec. 1.901-2(a)(2)(i), Income Tax Regs. ("A foreign levy is a tax if it requires a compulsory payment pursuant to the authority of a foreign country to levy taxes.").

On the basis of these determinations the IRS disallowed portions of the FTCs that petitioner had claimed on its 2007-2009 returns. Petitioner contends that the Mexican taxes it paid were "compulsory" levies and that the IRS erred as a matter of law in disallowing credits therefor. We agree with petitioner and accordingly will grant its motion for partial summary judgment.

## Background

The following facts are derived from the parties' pleadings and motion papers, including the attached declarations and exhibits. The facts are stated for the purpose of ruling on petitioner's motion for partial summary judgment and not as

findings of fact in this case. See Rule 1(b); Fed. R. Civ. P. 52(a); Cook v. Commissioner, 115 T.C. 15, 16 (2000), aff'd, 269 F.3d 854 (7th Cir. 2001). Petitioner had its principal place of business in Georgia when it petitioned this Court.

Petitioner is the parent of a group of companies that manufacture, sell, and distribute nonalcoholic ready-to-drink beverages in more than 200 countries. Petitioner began to expand internationally in the early 20th century. To support its international operations it established foreign licensees to manufacture Coca-Cola concentrate for sale to bottlers outside the United States. The parties refer to petitioner's foreign licensees as supply points.

A.  The Closing Agreement

Sometime before 1996 the IRS examined petitioner's Federal income tax returns for 1987-1989 to determine whether its supply points were paying royalties at arm's length for the use of petitioner's intangible property. This examination resulted in the execution of a closing agreement that covered petitioner's 1987-1995 tax years. This agreement established a method--the "10-50-50 method"--for calculating royalties payable for use of petitioner's intangible property. Under this method each supply point would retain 10% of its gross sales as a routine return, and the residual operating profit (after certain adjustments) would be split 50-50 between the supply point and petitioner.

The closing agreement provided penalty protection for petitioner both during the term of the agreement and for tax years after 1995. For tax years after 1995 the agreement provided that petitioner would meet the reasonable cause and good faith exceptions of sections 6664(c) and 6662(e)(3)(D) if its supply points continued to calculate royalties pursuant to the 10-50-50 method (or other method to which it and the IRS subsequently agreed). This protection applied to all of petitioner's then-existing and future supply points, including supply points operating as branches of petitioner.

The closing agreement expired on December 31, 1995. But the IRS examined petitioner's returns for each of the ensuing 11 years and concluded that "the continuing application of the closing agreement's terms and conditions to post-1995 years seems appropriate." Thus, as relevant here, the IRS limited its 1996-2006 examinations to determining whether the royalty amounts petitioner received from its supply points were consistent with the closing agreement. With one minor exception the IRS answered that question in the affirmative, making no adjustments to the royalty payments that petitioner received from its supply points during 1996-2006. All of these royalties were computed under the 10-50-50 method.

B.     The Mexico Licensee

Petitioner formed the Mexico Licensee in 1950.  For the tax years at issue the Mexico Licensee was a branch of the Coca-Cola Export Corp., a domestic subsidiary of petitioner and a member of petitioner's affiliated group that files consolidated Federal income tax returns.  Starting in 1950 and continuing through the years at issue, petitioner licensed to the Mexico Licensee the rights to manufacture and sell Coca-Cola concentrates, beverage bases, and syrups used in the preparation of finished beverages and to use petitioner's trademarks in connection with the sale of these products.  The Mexico Licensee paid Mexican corporate tax on the net income it derived from its operations.

Before 1998 Mexican tax law did not include an arm's-length standard for related-party transactions, and the Mexico Licensee before that time paid no royalties to petitioner for use of its intangible property.  But in 1997 Mexico amended its tax law to incorporate the arm's-length principle.  In response petitioner and the Mexico Licensee entered into an agreement, effective January 1, 1998, whereby the Mexico Licensee agreed to pay petitioner for the use of its intangible property a royalty calculated under the 10-50-50 method.  The Mexico Licensee requested permission from Mexico's Federal taxing authority, the Servicio de Administración Tributaria (SAT), to pay petitioner royalties computed in this manner.

In December 2000 the SAT notified the Mexico Licensee that it would per-mit royalty payments to petitioner under the 10-50-50 method for the 2000 tax year. On February 6, 2001, the SAT issued a formal Resolution (equivalent to a U.S. advance pricing agreement) covering the 2000 year, ruling that the 10-50-50 method resulted in an arm's-length royalty payment for Mexican tax purposes.

On January 1, 2001, petitioner and the Mexico Licensee executed a supple-mental agreement, effective that day, stipulating the payment of royalties under the 10-50-50 method.[2] In December 2001 the SAT issued a second Resolution, cover-ing the 2001-2004 tax years. The SAT again concluded that the 10-50-50 method represented a permissible application of the "residual profit split method" for Mexican tax purposes and resulted in an arm's-length royalty payment under Mex-ican law. The second Resolution expired by its terms on December 31, 2004. But the Mexico Licensee continued to pay royalties to petitioner consistently with the 10-50-50 method for all subsequent years, including the tax years at issue.

In continuing to calculate royalties in this manner, the Mexico Licensee and petitioner relied on advice from Luis Ortiz Hidalgo, a Mexican tax attorney who had helped obtain the two Resolutions described above. Mr. Ortiz had advised the

[2]This agreement was amended again in 2005 and 2009. None of the amend-ments altered the Mexico Licensee's use of the 10-50-50 method to compute its royalty payments.

Mexico Licensee concerning its Mexican tax obligations since 1974. He communicated regularly with petitioner's U.S. tax personnel, including Dennis A. Carr, petitioner's executive director for international taxes, to stay abreast of any changes that might affect the Mexico Licensee's royalty obligations. Mr. Ortiz was fully apprised of the IRS' examinations of petitioner's 1996-2006 tax years and the IRS' ongoing approval of royalties calculated under the 10-50-50 method.

After the second Resolution expired, Mr. Ortiz advised the Mexico Licensee to continue paying royalties to petitioner under the 10-50-50 method. He based this advice on his belief that there had been no changes in petitioner's operations or transactional relationship with the Mexico Licensee sufficient to justify a higher royalty rate. And he believed that the SAT would not have permitted the Mexico Licensee to reduce its Mexican income tax by paying higher royalties, especially since all of petitioner's other supply points continued to pay (with IRS approval) royalties calculated under the 10-50-50 method.

On the basis of Mr. Ortiz's advice, the Mexico Licensee for 2007-2009 paid petitioner royalties calculated under the 10-50-50 method. It deducted these payments on its Mexican tax returns and prepared appropriate transfer-pricing documentation to establish its compliance with the arm's-length standard in Mexico. It paid all taxes shown as due on its Mexican tax returns for these years.

Mr. Ortiz has averred that, for years before 2010, the SAT's only audit activity with respect to royalties paid by the Mexico Licensee was an examination for its 2008 tax year. During that examination the SAT inquired whether the Mexico licensee was still making royalty payments calculated under the 10-50-50 method. After receiving confirmation that the answer to this question was "yes," the SAT made no adjustments to the royalty payments.

C.    IRS Examination

Petitioner filed timely Forms 1120, U.S. Corporation Income Tax Return, for 2007-2009. Because the Mexico Licensee was a branch, all of its taxable income was reported on these consolidated returns. Petitioner included in these returns Forms 1118, Foreign Tax Credit--Corporations, on which it claimed FTCs for the taxes the Mexico Licensee had paid to Mexico. The FTCs thus claimed totaled $87,409,718 for 2007, $80,332,190 for 2008, and $86,812,306 for 2009.

The IRS selected petitioner's 2007-2009 returns for examination. On January 26, 2011, the IRS informed petitioner that it intended to examine petitioner's intercompany royalty payments. On April 12, 2011, it sent petitioner a letter stating that it was considering adjustments to the royalty payments due from the Mexico Licensee for 2007-2009. Since the Mexico Licensee was a branch, such ad-

justments would produce no net change to petitioner's U.S. income, only a decrease to the claimed FTCs.

The IRS letter explained that any adjustments to the Mexico Licensee's royalty payments might result in double taxation for which petitioner would have the right to seek competent authority relief under the U.S.-Mexico treaty. See Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Mex.-U.S., Sept. 18, 1992 (treaty), Treaty Doc. No. 103-07, reprinted in 2 Tax Treaties (CCH) at 5903. On September 26, 2013, petitioner requested that the United States initiate, pursuant to article XXVI(2) of the treaty, a competent authority proceeding with Mexico. The Mexico Licensee concurrently requested that the SAT initiate a competent authority proceeding with the United States.

On September 15, 2015, the IRS sent petitioner a notice of deficiency that substantially increased, under section 482, the royalty amounts payable to petitioner by its supply points, including the Mexico Licensee. The IRS made offsetting income adjustments, increasing petitioner's royalty income and decreasing the Mexico Licensee's income by the same amounts. Of concern here, the IRS made "correlative adjustments" decreasing petitioner's FTCs by $43,457,473 for 2007, $50,453,126 for 2008, and $44,893,902 for 2009.

The IRS based its disallowance of the FTCs on the contention that the Mexico Licensee had claimed insufficient deductions for royalty payments on its Mexican corporate returns and to that extent had overpaid Mexican income tax. To the extent of these alleged overpayments, the IRS determined that the taxes paid to the Government of Mexico were not "compulsory" and hence were not "taxes" within the meaning of section 901. On October 15, 2015, the IRS notified petitioner that it would not participate in competent authority proceedings with Mexico because it had "designated for litigation the issue pertaining to the transfer pricing adjustments for tax years 2007, 2008, and 2009." On December 14, 2015, petitioner timely petitioned this Court to challenge (among other things) the disallowance of the Mexico FTCs.

## Discussion

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). Either party may move for summary judgment upon all or any part of the legal issues in controversy. Rule 121(a). A motion for summary judgment or partial summary judgment will be granted only if it is shown that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter

of law.  See Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).

Petitioner has shown that no genuine dispute exists as to any material fact. As we explain in greater detail below, the facts respondent alleges to be in dispute are irrelevant for purposes of determining whether the taxes paid to the Government of Mexico were "compulsory."  We conclude that the Mexico Foreign Tax Issue may appropriately be adjudicated summarily.

A.     Governing Legal Framework

The United States taxes its citizens and domestic corporations on their worldwide income.  See, e.g., Cook v. Tait, 265 U.S. 47, 56 (1924); Huff v. Commissioner, 135 T.C. 222, 230 (2010).  Because this policy creates the potential for double taxation, the Code since 1918 has allowed U.S. citizens and domestic corporations a credit for income taxes paid to a foreign country.  Sec. 901(a); Am. Chicle Co. v. United States, 316 U.S. 450 (1942); Vento v. Commissioner, 147 T.C. 198, 203-204 (2016).  The extent to which a taxpayer is entitled to FTCs is determined by applying domestic tax law.  United States v. Goodyear Tire & Rubber Co., 493 U.S. 132 (1989); Phillips Petroleum Co. v. Commissioner, 104 T.C. 256, 295 (1995).

Section 901(b) allows a credit for "the amount of any income * * * taxes paid or accrued during the taxable year to any foreign country." A foreign levy is creditable under section 901 only if its "predominant character * * * is that of an income tax in the U.S. sense." Sec. 1.901-2(a)(3), Income Tax Regs. The parties agree that the Mexican corporate income taxes paid by the Mexico Licensee during 2007-2009 met this requirement.

In order to be creditable, a foreign levy must also be a "compulsory payment pursuant to the authority of a foreign country to levy taxes." Sec. 1.901-2(a)(2)(i), Income Tax Regs. "Whether a foreign levy requires a compulsory payment pursuant to a foreign country's authority to levy taxes is determined by principles of U.S. law and not by principles of law of the foreign country." Ibid. A tax payment is not considered compulsory to the extent "the amount paid exceeds the amount of liability under foreign law for tax." Id. para. (e)(5)(i).

Two requirements must be satisfied in order for a foreign tax payment to be considered "compulsory." First, the payment must be "determined by the taxpayer in a manner that is consistent with a reasonable interpretation and application of the * * * provisions of foreign law (including applicable tax treaties) in such a way as to reduce, over time, the taxpayer's reasonably expected liability under foreign law for tax." Ibid. Second, "the taxpayer [must] exhaust[] all effective and prac-

tical remedies, including invocation of competent authority procedures available under applicable tax treaties, to reduce, over time, the taxpayer's liability for foreign tax." Ibid.

B. Analysis

Respondent's disallowance of the Mexican FTCs is based on the transfer-pricing adjustments set forth in the notice of deficiency. The IRS contends that the effect of these adjustments, proposed in 2015, is to convert into noncompulsory payments more than half the taxes petitioner paid to the Government of Mexico for 2007-2009. We evaluate this argument under the regulatory standards outlined above.

1. Reasonable Interpretation of Foreign Law

In ascertaining whether the amounts of tax petitioner paid to Mexico "exceed[ ] the amount[s] of liability under foreign law for tax," we first consider whether petitioner calculated its Mexican tax liabilities "in a manner that is consistent with a reasonable interpretation and application" of Mexican law, so as to minimize its reasonably expected liabilities for Mexican corporate income tax. See sec. 1.901-2(e)(5)(i), Income Tax Regs. The regulations do not specify what constitutes a "reasonable interpretation and application" of foreign law. But they do provide a safe harbor by allowing taxpayers to rely on good-faith advice from a

competent tax professional. "In interpreting foreign tax law, a taxpayer may generally rely on advice obtained in good faith from competent foreign tax advisors to whom the taxpayer has disclosed the relevant facts." Ibid. However, "[a]n interpretation or application of foreign law is not reasonable if there is actual notice or constructive notice * * * to the taxpayer that the interpretation or application is likely to be erroneous." Ibid.

In calculating the deductions for royalty payments that would be allowable to the Mexico Licensee under Mexican law, petitioner relied on the advice of Mr. Ortiz. There is no dispute that he is a competent and experienced tax lawyer who has advised the Mexico Licensee for many years regarding its Mexican tax obligations. When Mexico adopted the arm's-length standard in 1997, Mr. Ortiz assisted the Mexico Licensee in securing two Resolutions from the SAT. In both instances the SAT ruled that the 10-50-50 method resulted in arm's-length royalty payments for Mexican tax purposes and hence that the royalty payments were allowable deductions under Mexican law.

After the second Resolution expired, Mr. Ortiz advised the Mexico Licensee to continue paying royalties to petitioner under the 10-50-50 method. He based this advice on his belief, derived from regular communications with petitioner's tax personnel, that there had been no change in petitioner's operations or transac-

tional relationship with the Mexico Licensee sufficient to justify a higher royalty rate. Mr. Ortiz likewise concluded that the SAT would not have permitted the Mexico Licensee to reduce its Mexican corporate income tax by paying higher royalties, especially since all of petitioner's other supply points continued to pay royalties (with evident IRS approval) calculated under the 10-50-50 method. The SAT in fact made no adjustments to the Mexico licensee's royalty payments for 2007-2009 after confirming that those payments continued to be made in accordance with the 10-50-50 method.

These facts show that petitioner, in interpreting Mexican tax law, "rel[ied] on advice obtained in good faith from [a] competent foreign tax advisor[]" as to the appropriate amounts of the royalty payments. See sec. 1.901-2(e)(5)(i), Income Tax Regs. At the time petitioner received this advice, moreover, it did not have "actual notice or constructive notice" that Mr. Ortiz's interpretation of Mexican law was "likely to be erroneous." Ibid. Petitioner received Mr. Ortiz's advice during 2007-2009; at that time, the IRS continued to approve royalty payments calculated under the 10-50-50 method, having informed petitioner that "the continuing application of the closing agreement's terms and conditions to post-1995 years seems appropriate." The earliest date on which the IRS could be

thought to have informed petitioner that it might take a different view was January 26, 2011, well after petitioner filed its tax returns for 2007-2009.[3]

These facts establish that petitioner determined its Mexican tax liability for 2007-2009 in a manner consistent with a reasonable interpretation and application of the provisions of foreign law. Respondent's principal argument against this conclusion is that there exists a dispute of fact as to whether Mr. Ortiz based his advice on facts that were fully disclosed to him. See sec. 1.901-2(e)(5)(i), Income Tax Regs. (allowing taxpayer to rely on advice from an adviser "to whom the taxpayer has disclosed the relevant facts").

Relying on one of his own declarations, respondent notes that petitioner between 2001 and 2006 shifted a significant portion of the Mexico Licensee's manufacturing operation to a supply point in Ireland. Partly as a result of this shift, the

---

[3]Respondent contends that the timing of his notice to petitioner is irrelevant and that, when he provided notice of possible section 482 adjustments to petitioner in 2011, petitioner was retroactively "on notice" as of 2007-2009. This argument is hard to take seriously. The regulations clearly indicate that the judgment as to whether an interpretation of foreign law "is likely to be erroneous" is to be made at the time the foreign tax is paid. Petitioner cannot have had actual or constructive notice of a fact during 2007-2009 when the communication that put it on notice of that fact did not occur until 2011. See sec. 1.901-2(e)(5)(ii), Example (2), Income Tax Regs. (concluding that taxpayers lacked notice that their interpretation of foreign law was likely to be erroneous until the IRS made a section 482 reallocation); cf. Vento, 147 T.C. at 209-210 (concluding that taxpayers were notified that their interpretation of foreign law was likely erroneous when they received an IRS communication to that effect).

Irish supply point's sales of concentrate to the Mexican market increased from zero in 2000 to $377.8 million in 2006, whereas the Mexico Licensee's sales decreased from $889.6 million in 2002 to $395.5 million in 2004. Respondent asserts that there is a dispute of material fact about whether and how Mr. Ortiz took this production shift into account when rendering his advice.

We are not persuaded by this argument. Explicitly or implicitly, the IRS approved use of the 10-50-50 method by all of petitioner's supply points throughout the world from 1987 through 2006. During this 20-year period the revenues and profits of petitioner's supply points may have undergone significant year-to-year changes owing (among other things) to local economic recessions, worldwide financial crises, and variations in production and efficiency. There is nothing in the original closing agreement or in subsequent IRS audit activity to suggest that the 10-50-50 formula was supposed to change depending on such variables.

To the contrary, given how the 10-50-50 formula worked, the production shifts cited by respondent are wholly irrelevant. The formula operated the same way regardless of a particular supply point's economic results: The supply point kept 10% of gross sales (whatever they were) and split with petitioner the residual operating profit (whatever it was). As a result of the production shifts cited by respondent, the royalties payable by the Mexico Licensee went down, and the royal-

ties payable by the Irish supply point presumably went up. If a particular supply point departed from the 10-50-50 method without other supply points' making adjustments in the opposite direction, the whole system would quickly go entropic. It seems obvious that the 10-50-50 method that the IRS embraced before 2011 did not countenance such ad hoc adjustments.

Mr. Ortiz was required to provide petitioner with a "reasonable interpretation and application" of Mexican law. See sec. 1.901-2(e)(5)(i), Income Tax Regs. Mexican law required royalty payments to be made at arm's length, and Mr. Ortiz advised petitioner that royalties calculated using the 10-50-50 method would meet Mexico's arm's-length standard. Annual variations in a supply point's revenues or profits were irrelevant under the 10-50-50 method. Whether Mr. Ortiz was informed of, or evaluated the effect of, the production shift to Ireland is thus not a material fact.

Respondent also contends that the descriptions of the Mexico Licensee's functions, assets, and risks that petitioner supplied to the SAT when obtaining the two Resolutions may differ from the facts ultimately found at trial. This dispute conceivably may affect the merits of the section 482 adjustments that the IRS has proposed. But we fail to see the relevance of this dispute in ascertaining whether

petitioner "disclosed the relevant facts" to Mr. Ortiz about the ongoing appropriateness of the 10-50-50 method.  See ibid.

Mr. Ortiz advised petitioner on several occasions that the SAT would not have permitted the Mexico Licensee to pay royalties higher than those computed under the 10-50-50 method.  Especially was that so when all of petitioner's other supply points were paying (with evident IRS approval) royalties computed under the 10-50-50 method.  This advice was sufficient for petitioner to conclude that an attempt by the Mexico Licensee to pay higher royalties would not enable it "to reduce, over time, * * * [its] reasonably expected liability under foreign law for tax."  Ibid.

The gist of respondent's submission concerns a possible dispute at trial as to whether the Mexico Licensee held more valuable assets (or retained more significant risks) than the SAT understood in 2000.  It is hard to see how this factual uncertainty, if known to the SAT back then, would have supported the payment of higher royalties to petitioner.  In any event, the determination of whether Mr. Ortiz's interpretation of Mexican law was reasonable must be made on a prospective

basis.  He obviously could not have known during 2007-2009 what facts would be established at trial in 2018.[4]

In sum, we find that petitioner relied in good faith on advice that it obtained from Mr. Ortiz in determining the royalties properly payable under Mexican law for 2007-2009.  At the time petitioner received this advice, it did not have "actual notice or constructive notice" that the interpretation of Mexican law adopted by Mr. Ortiz was "likely to be erroneous."  See sec. 1.901-2(e)(5)(i), Income Tax Regs.  And we find, contrary to respondent's submission, that petitioner disclosed to Mr. Ortiz all facts relevant to his assessment of the appropriateness under Mexican law of royalties calculated under the 10-50-50 method.  We thus conclude that petitioner has satisfied the first half of the regulatory test by showing that it determined its Mexican tax liability "in a manner that is consistent with a reasonable interpretation and application" of Mexican law.  See ibid.

---

[4]Respondent also contends that the penalty protection provision of the closing agreement "is irrelevant as a matter of law."  In considering whether the Mexican taxes were "compulsory" we do not rely on the penalty protection provision.  Rather, we rely on the fact (upon which Mr. Ortiz also relied) that the IRS for a 20-year period had explicitly or implicitly approved calculation of royalties using the 10-50-50 method.  To the extent respondent contends that the closing agreement as a whole is irrelevant, we rejected that argument in our September 7, 2017, order denying respondent's motion for partial summary judgment.

## 2. Exhaustion of Remedies

The second half of the regulatory test for a "compulsory" tax requires that the taxpayer must "exhaust[] all effective and practical remedies, including invocation of competent authority procedures available under applicable tax treaties, to reduce, over time, the taxpayer's liability for foreign tax." Sec. 1.901-2(e)(5)(i), Income Tax Regs.; see Rev. Rul. 76-508, 1976-2 C.B. 225, 226. A remedy is considered effective and practical "only if the cost thereof * * * is reasonable in light of the amount at issue and the likelihood of success." Sec. 1.901-2(e)(5)(i), Income Tax Regs.

Petitioner contends that respondent's reliance on section 482 adjustments that have not yet been adjudicated, combined with his refusal to participate in competent authority proceedings, means that petitioner has exhausted its available remedies for FTC purposes. We agree with petitioner. Respondent cannot point to any effective and practical remedy that petitioner could now pursue to reduce its liability for Mexican tax. If the Mexico Licensee were to file a refund claim in Mexico, that claim would be premature because respondent's proposed section 482 adjustments have not yet been adjudicated. Cf. Rev. Rul. 92-75, 1992-2 C.B. 197; Rev. Rul. 80-231, 1980-2 C.B. 219 (holding that a taxpayer generally must file a foreign refund claim in order to exhaust administrative remedies).

Even if a refund claim were not premature, there is no reason to believe that the Mexican Government would agree with the IRS' reallocation of income. Indeed, the SAT has issued two Resolutions ruling that the 10-50-50 method yielded royalty payments that were consistent with the arm's-length requirement of Mexican tax law. Mr. Ortiz opined that Mexico would not have allowed the Mexico Licensee to pay higher royalties under these circumstances.

A taxpayer "is not required to take futile additional administrative steps" in order to satisfy the exhaustion-of-remedies requirement. Schering Corp. v. Commissioner, 69 T.C. 579, 602 (1978) (holding Swiss income tax creditable notwithstanding disagreement between Switzerland and the United States concerning the underlying tax issue). Whether a remedy is "effective and practical" must be judged considering "the likelihood of success." Sec. 1.901-2(e)(5)(i), Income Tax Regs.; see id. subdiv. (ii), Example (3) (finding foreign tax payment compulsory where pursuing a judicial refund remedy in foreign country "would be unreasonable in light of the amount at issue and the likelihood of * * * success"). We conclude that petitioner's pursuit of a refund claim in Mexico before respondent's section 482 claims have been adjudicated would be futile.

Since petitioner has no effective and practical remedies in Mexico, its only possible remedy would be a competent authority proceeding. Depending on the

facts and circumstances, a taxpayer may be required to invoke available competent authority relief to demonstrate exhaustion of remedies for purposes of section 901.[5] But petitioner did invoke competent authority procedures. It and the Mexican Licensee both requested that the IRS initiate or participate in such a proceeding, but the IRS refused to do so. Respondent is in a poor position to contend that petitioner has failed to exhaust its remedies when respondent, by his unilateral action, has made it impossible for petitioner to pursue the only remedy that exists.[6]

---

[5]See, e.g., Proctor & Gamble Co. v. United States, 2010 WL 2925099, at *10 (S.D. Ohio July 6, 2010) (disallowing certain FTCs for failure to seek relief from the Japanese tax authority and to invoke competent authority proceeding in Japan); Rev. Rul. 92-75, 1992-2 C.B. 197 (ruling foreign tax noncompulsory where taxpayer was aware of, but failed to invoke, competent authority proceeding); Rev. Proc. 2015-40, secs. 1.04, 2.03, 6.04(3)(a), 2015-35 I.R.B. 236, 237, 241, 249. But see Schering Corp., 69 T.C. at 602-603 (holding that taxpayer's failure to seek competent authority relief was not fatal where arguably "there was no double taxation from which it might have sought relief").

[6]Respondent errs in relying on Rev. Proc. 2006-54, 2006-2 C.B. 1035, superseded by Rev. Proc. 2015-40, 2015-35 I.R.B. 236, for the proposition that invocation of competent authority procedures, by itself, is insufficient to demonstrate exhaustion of remedies. The regulations explicitly list "invocation of competent authority procedures" as an example of exhaustion of remedies. Sec. 1.901-2(e)(5)(i), Income Tax Regs. Under the facts hypothesized in Rev. Proc. 2006-54, sec. 11, "the taxpayer ha[d] sought competent authority assistance but obtained no relief, either because the competent authorities failed to reach an agreement or because the taxpayer rejected an agreement reached by the competent authorities." 2006-2 C.B. at 1046. Here, the reason petitioner could obtain no relief is that the IRS unilaterally refused to participate.

Lacking any plausible argument that petitioner has effective remedies available to it now, respondent contends that the Mexican taxes were not "compulsory" because petitioner may have remedies available to it years from now. In respondent's view, petitioner must first litigate this case to conclusion. If this Court sustains the proposed transfer-pricing adjustments in whole or in part, with corresponding downward adjustments to the Mexican FTCs, petitioner must then seek relief through a competent authority proceeding. If, as a result of that proceeding, petitioner's Mexican tax bill for 2007-2009 ends up being higher than the liability presupposed by this Court's Opinion, petitioner would be allowed a credit for the incremental Mexican tax at that time.

This is not the procedure that Congress envisioned when it enacted the Code. Congress anticipated the difficulty of ascertaining, at the time a taxpayer files its U.S. return, the exact amount of foreign tax that will ultimately be allowable as a credit. It accordingly provided, in section 905(c), a special procedure for adjusting the credit when the taxpayer's ultimate foreign tax liability varies from the amount claimed. Section 905(c)(1) specifies three situations, sometimes referred to as "foreign tax redeterminations," in which a U.S. taxpayer's foreign tax credit must be adjusted. One of these situations is where "any tax paid is refunded in whole or in part." Sec. 905(c)(1)(C).

If any foreign tax paid is refunded in whole or in part, the U.S. taxpayer generally must file an amended return. See sec. 1.905-4T(b)(1), Temporary Income Tax Regs., 72 Fed. Reg. 62784 (Nov. 7, 2007).[7] The taxpayer must include with this amended return a revised Form 1118 and information sufficient to enable the IRS to redetermine the taxpayer's U.S. tax liability. Id. paras. (b)(1), (3), (c). Any U.S. tax due as a result of the Secretary's redetermination is not subject to deficiency procedures but "shall be paid by the taxpayer on notice and demand by the Secretary." Secs. 905(c)(3), 6213(h)(2)(A); see Sotiropoulos v. Commissioner, 142 T.C. 269 (2014); Sotiropoulos v. Commissioner, T.C. Memo. 2017-75, 113 T.C.M. (CCH) 1370, 1373-1374.

The Court of Federal Claims recognized the availability of this procedure in IBM Corp. v. United States, 38 Fed. Cl. 661 (1997). Resolution of the question there, whether an Italian corporate tax was a "compulsory" levy, depended in part on whether the taxpayer had "exhaust[ed] all effective and practical remedies" to reduce its Italian tax. Sec. 1.901-2(e)(5)(i), Income Tax Regs. The taxpayer had initiated litigation in the Italian courts to determine its liability, but that litigation was still ongoing. See IBM Corp., 38 Fed. Cl. at 664.

---

[7]Because this temporary regulation was issued before November 20, 1988, it is not subject to section 7805(e)(2), which prescribes that temporary regulations issued after that date expire within three years from the date of issuance.

The Government contended that the taxpayer should be deemed not to have exhausted its available remedies until the Italian courts had conclusively determined its Italian tax liability. The Court of Federal Claims rejected that argument:

> [A] taxpayer may claim a foreign tax credit for the year in which it pays the foreign tax, notwithstanding that the taxpayer continues to contest its liability in the foreign country. Should the taxpayer ultimately receive a refund from the foreign government, the taxpayer must reimburse the Secretary for the amount originally credited pursuant to I.R.C. § 905(c). [Id. at 674.]

Although the taxpayer's ultimate Italian tax liability remained uncertain, the court held that the taxpayer had satisfied the "exhaustion of remedies" requirement and was entitled to FTCs for the Italian taxes paid.

The Secretary himself took the same position in an earlier revenue ruling. See Rev. Rul. 70-290, 1970-1 C.B. 160. The taxpayer there had been assessed foreign income tax but had filed claims for overassessment with the foreign government. Those claims were still pending. In stark contrast to respondent's current position, which asserts that "effective and practical remedies must be pursued to a final conclusion," the IRS ruled that the taxpayer was entitled to an FTC even though its ultimate foreign tax liability remained uncertain:

> It is not the intention of the law to deprive the taxpayer of the right to obtain credit for foreign taxes because of the fact that the taxpayer * * * protests the assessment and has made application for a refund. The tax assessed constitutes a liability against the taxpayer. In the

instant case such liability was met by actual cash disbursements. If the protest by the taxpayers against the original assessment prevails, any difference can readily be adjusted pursuant to the provisions of section 905(c) of the Code. [1970-1 C.B. at 161.]

Respondent replies that petitioner "would have no incentive * * * to seek correlative relief from Mexico" regardless of how the transfer-pricing adjustments are ultimately resolved. If petitioner were to get a refund of Mexican tax, that refund would likely be offset dollar-for-dollar by a reduction in its FTCs pursuant to section 905(c). Since petitioner might find nothing to be gained by seeking competent authority relief, respondent urges that petitioner's position "would force the United States to cede taxing rights to Mexico even if the Court were to uphold respondent's adjustments in full."

We find this argument unpersuasive for at least two reasons. First, respondent need not rely on petitioner or its Mexican branch to seek competent authority relief. The IRS is perfectly capable of initiating competent authority proceedings with the SAT directly if it believes that such proceedings are necessary to correct a fiscal imbalance under the treaty. See treaty art. XVI(3) ("The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application" of the treaty); Rev. Proc. 2015-40, sec. 2.01(2), 2015-35 I.R.B. 236 (stating that U.S.

competent authority may "consult generally with foreign competent authorities to resolve difficulties or doubts regarding treaty interpretation or application, irrespective of whether the consultation relates to a current matter involving a specific taxpayer").

Second, the argument respondent is advancing is a policy argument that derives no support from the text of section 901, the governing regulations, or prior IRS rulings. The Mexican corporate income taxes petitioner paid for 2007-2009 were "compulsory" because petitioner determined its liability "in a manner that is consistent with a reasonable interpretation and application" of Mexican law and has "exhaust[ed] all effective and practical remedies * * * to reduce" its Mexican tax liability. Sec. 1.901-2(e)(5)(i), Income Tax Regs. Nothing in the regulatory framework requires petitioner to wait until the instant litigation and its aftermath have finally concluded in order to claim FTCs for foreign taxes it has paid. "If the IRS considers that protection of the public fisc requires prohibiting foreign tax credits until the taxpayer exhausts its litigation remedies, the IRS should seek an amendment to the final regulations. That is a task for the Secretary of the Treasury, not this court." IBM Corp., 38 Fed. Cl. at 675.

This case presents a scenario that Congress anticipated when it enacted section 905(c). Petitioner's ultimate liability for Mexican tax cannot now be deter-

mined because: (1) respondent's section 482 adjustments have not yet been adjudicated and (2) if those adjustments are sustained in whole or in part, petitioner may or may not receive a refund of Mexican tax. The U.S. competent authority may seek correlative relief from a treaty partner after "a U.S. federal court's final determination" of the taxpayer's tax liability. Rev. Proc. 2015-40, sec. 6.05(2). The Secretary would be free to initiate a competent authority proceeding with Mexico after the transfer-pricing adjustments at issue in this case have become final. See sec. 7481(a).

If, as the result of a future competent authority proceeding, the Mexican tax petitioner paid for 2007-2009 is ultimately "refunded in whole or in part," sec. 905(c)(1)(C), the IRS will redetermine petitioner's U.S. tax liability for those years. The additional tax due will then be paid by petitioner "on notice and demand by the Secretary." See sec. 905(c)(3); Sotiropoulos, 113 T.C.M. (CCH) at 1373-1374. Congress did not intend that FTCs would be denied up front because of the possibility that foreign taxes might in the future be refunded. Rather, Congress envisioned that the accounts would be squared if and when foreign taxes are in fact refunded.

In sum, we conclude that petitioner has exhausted all "effective and practical remedies" to reduce its liability for Mexican tax. See sec. 1.901-2(e)(5)(i),

Income Tax Regs. Because respondent's section 482 adjustments have not yet been adjudicated, petitioner currently has no remedy before the Mexican tax authorities. The only remedy that would be "effective and practical" at the moment would be a competent authority proceeding, in which the IRS has refused to participate. We accordingly hold that the Mexican taxes paid by the Mexico Licensee for 2007-2009 were "compulsory" levies for which petitioner is entitled to FTCs under section 901(a).

To reflect the foregoing,

<u>An order will be issued granting petitioner's motion for partial summary judgment</u>.